# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Deon Green**

    1201 Oak Dr. SE
    Washington, DC 20032,

*Plaintiff,*

    v.

**United States of America**

    SERVE:
    Federal Tort Claims Act Section
    Tort Branch, Civil Division
    U.S. Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530-0001

    U.S. Attorney's Office
    Civil Process Clerk
    555 Fourth St. NW
    Washington, DC 20530

    U.S. Attorney General Garland
    U.S. Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530-0001

*Defendant.*

## FEDERAL TORT CLAIMS ACT COMPLAINT

### I.       Preliminary Statement

1.       On May 5, 2022, Mr. Deon Green was looking forward to the end of his time in the Federal Bureau of Prisons. He was trying to mind his own business, sit in his cell, and watch TV. That was not good enough for one of the correctional officers, who decided to turn his well-known temper on Mr. Green. Unprovoked, that officer assaulted Mr. Green, discharging OC spray in his face and hitting him with his prison key ring. Then, after Mr. Green was transferred to another prison, more officers continued to assault him, breaking his ribs and leaving him in pain and without water or food.

2.       This action seeks compensatory damages for injuries suffered by the Plaintiff, Mr. Deon Green, when he was assaulted by multiple employees of the Federal Bureau of Prisons.

### II.      Jurisdiction and Venue

3.       This Court has subject matter over this matter under 28 U.S.C. § 1331, 29 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1346(b)(1).

4.       As Mr. Green resides in this judicial district, venue is proper in this court under 28 U.S.C. § 1402(b).

### III.     Parties

5.       Mr. Green is a 50-year-old, African American, native Washingtonian. He is a lifelong resident of the District of Columbia. During the relevant time period, he was committed to the care and safekeeping of the Federal Bureau of Prisons. He is now out of custody.

6.      Defendant United States of America is a sovereign country subject to liability for the tortious acts and omissions of its employees through the Federal Tort Claims Act.


IV.    **Exhaustion of Administrative Claims**

7.      Mr. Simmons filed a timely claim with the Bureau of Prisons by sending it to the Mid-Atlantic Regional Office of the Federal Bureau of Prisons within two years of the date his claim accrued, pursuant to 28 U.S.C. § 2401(b).

8.      More than six months have passed since the claim was filed, yet the Bureau of Prisons has not yet made a final disposition of the claim. Mr. Green, therefore, deems this claim denied pursuant to 28 U.S.C. § 2675(a).


V.    **Factual Background**

9.      In May 2022, Mr. Green was serving a felony sentence at the Federal Correctional Institution Gilmer, in Glenville, WV. FCI Gilmer is a medium-security federal prison.

10.      Mr. Green had been at FCI Gilmer for about two-and-a-half years and was due to be released shortly. He was looking forward to returning to Washington, DC.

11.      Mr. Green was living in the A-4 Unit, which was a work unit. He was working in the Vocational Training program at FCI Gilmer, learning how to install and work with concrete flooring.

12.      He considered this a good job because it paid a high rate for prison jobs, about $120 per month.

13.     On May 5, 2022, in the late morning, Mr. Green returned back to his living unit after completing his shift at Vocational Training. The men had been let out early in celebration of Cinco de Mayo.

14.     The unit was busy, with men gathering in common areas, walking around the unit, watching TV, and other activities. Mr. Green's cellmate was on the unit, out of the cell.

15.     It was almost time for the daily census count, a process by which all the men in the prison are accounted for.

16.     Mr. Green liked to stay to himself, so as he usually did, he put his chair in the front of his cell—cell 206—so that he could watch TV alone from inside the safety of his cell. Surveillance video confirms that his chair was inside his cell.

17.     BOP Correctional Officer Gainer was assigned to Mr. Green's living quarters. He had a reputation among the men held there for targeting Black men, especially those from the District of Columbia, for escalating situations, for manufacturing physical confrontations, and being generally aggressive towards the men in his care.

18.     Officer Gainer was also known to use Oleoresin Capsicum spray (this is commonly called "pepper spray" or "OC spray") against the incarcerated men for small infractions.

19.     Mr. Green knew what standard BOP-issued OC spray looked like, since he had been in custody for several decades. He had seen Officer Gainer use OC spray that was not the standard BOP issued spray—rather it appeared to be personally purchased spray.

20.     That afternoon, as Mr. Green sat on the chair in his cell, Officer Gainer rushed toward Mr. Green, angrily yelling and gesturing, complaining about his chair. He was screaming that it was outside the cell and was some sort of rules violation.

4

21.     Mr. Green, knowing of Officer Gainer's reputation, did not argue. He moved his chair further inside his cell, hoping to avoid conflict.

22.     As captured by the surveillance cameras, Officer Gainer responded by ordering Mr. Green to leave his cell.

23.     Again, Mr. Green hoped to avoid conflict, so he moved past Officer Gainer to stand nearby during a cell search.

24.     Officer Gainer Officer Gainer, despite facing no threat, pulled his OC spray from his belt, pointed at Mr. Green's face, and sprayed it at close range. As he did this, he yelled at Mr. Green that "your date is just a stupid number." Mr. Green understood that date referred to his impending release date.

25.     This close use of the pepper spray is against BOP policy, which requires that it be deployed no closer than four feet from someone.

26.     Officer Gainer therefore used unlawful excessive force against Mr. Green.

27.     In response to this unlawful excessive force, Mr. Green tried to block the spray with his arm and backed up. Understanding that he had no way to escape Officer Gainer's continued threat of excessive force and threat to his life, Mr. Green tried to bat the OC spray away from his face.

28.     In response, Officer Gainer stepped closer to Mr. Green and then sprayed pepper spray in his face a second time. Officer Gainer then threw Mr. Green the ground, pinned him and put him in a headlock, immobilizing him.

29.     Other officers, whose identities are currently unknown, arrived at the unit as Officer Gainer struck Mr. Green in his face with keys, lacerating his face.

30.     After the beating, Mr. Green was immediately taken to out of FCI Gilmer and moved to USP Hazelton, in Bruceton Mills, WV, two hours to the northeast. He had been given no treatment except for bandages. As Mr. Green sat restrained in the transport vehicle, the OC spray continued to burn his face and eyes.

31.     USP Hazelton is a high security federal prison, known for its brutal treatment of men held there and nicknamed by prisoners "Misery Mountain."

32.     At USP Hazelton, BOP staff used their power to unofficially punish Mr. Green for fighting back against Officer Gainer.

33.     After a nurse checked Mr. Green's restraints to confirm that they were not too tight, Lieutenant Cokely and another staff member known as "Big Vernon" took Mr. Green into a cell, where the mattress had been removed from a metal bed.

34.     These BOP officers then tightened Mr. Green's restraints on his ankles and wrists, to the point that they were uncomfortably tight, cutting off his circulation in his extremities.

35.     The officers threw Mr. Green down on the metal bed and then kicked him, so that he fell off the other side and broke a rib. To this day, his rib has not healed correctly.

36.     Although Mr. Green was supposed to stand every 15 minutes for checks, after an hour, his feet were so swollen that he could not stand on them.

37.     For over 30 hours, Mr. Green was held in these tight restraints, denied water, or the use of a toilet.

38.     At one point, the officer known as Big Vernon came in with a food tray, but once in the cell and out of the sight of cameras, dumped the peanut butter and jelly sandwich and the banana in the cell toilet.

39.     At the end of those 30 hours, Mr. Green was released from the in-cell shackles.

40.     Over the next eight days, officers would bring him a meal tray to his cell, but once inside and out of the camera view, they would remove the cover revealing that it was empty.

41.     At the end of this period, another officer finally brought him a meal tray. Mr. Green heard that officer later being chastised for that act of following the rules.

42.     While the United States charged Mr. Green with two counts of assault, he raised the defense that he was acting to protect himself from serious bodily injury or death. A jury in the Northern District of West Virginia found him not guilty on both counts.


**Count One**

**Assault and Battery**


43.     Defendant United States of America, through its officers and employees, owed Mr. Green—a person completely dependent on it for his care and safety—a duty to not assault and batter him.

44.     Defendant United States of America breached this duty when BOP officers, including Officer Gainer, other employees of FCI Gilmer, Lieutenant Cokely, "Big Vernon," and other employees of USP Hazelton sprayed him with pepper spray, beat him, broke his ribs, and held him in tight shackles without access to water or a toilet.

**WHEREFORE**, Plaintiff prays for a judgment against the United States awarding compensatory damages, the costs of this litigation, and any other relief deemed appropriate by this Court.

Respectfully submitted,
*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470-578
The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com